UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROXANNE ELIE,

        Plaintiff,

v.

HEALTH CARE AND RETIREMENT
CORPORATION OF AMERICA,

        Defendant.

_____/

Case No. 05-73071

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [30]**

Pending before this Court is Defendant Health Care and Retirement Corporation of America's Motion for Summary Judgment, filed on October 16, 2006. Plaintiff Roxanne Elie brought suit against Defendant alleging unlawful discrimination and retaliation in response to Plaintiff filing complaints of insufficient patient care with the State of Michigan's Department of Community Health (the "Community Health Department"). Plaintiff's claim arises under the Michigan Whistleblowers' Protection Act (the "WPA"), Mich. Comp. Laws § 15.361, *et seq.* This case was originally filed in Michigan state court, and Defendant removed it to this Court on August 8, 2005 under diversity jurisdiction.[1]

Defendant argues that (1) Plaintiff is unable to establish the requisite causal link

_____

[1]As used in this Order, "Complaint" refers to Plaintiff's Amended Complaint in this case, filed on August 31, 2006, (Docket No. 27) while a "complaint" refers to one of her numerous allegations of improper patient care lodged with Defendant or state authorities.

1

between the protected activity and her termination to state a prima facie case of retaliation, (2) Plaintiff has not shown that Defendant's stated justification that she was terminated for falsifying a patient's medical chart was pretext for unlawful retaliation, and (3) Plaintiff brought her WPA claim in bad faith. For the reasons set forth below, the Court GRANTS Defendant Health Care and Retirement Corporation of America's motion for summary judgment, and this case is DISMISSED.

## I.  FACTS

Defendant employed Plaintiff as a Nurse Supervisor LPN[2] at its Dearborn Heights Heartland nursing home facility starting on November 3, 1998. (Pl.'s Resp. at 1.) Plaintiff was terminated on July 29, 2005 for falsifying a resident's medical chart, an offense for which seven other nurses were terminated between September 2002 and the end of 2005. (Def.'s Mot. for Summ. J. (hereinafter, "Def.'s Mot.") at 1; Ex. M.)

Plaintiff filed at least seventeen internal complaints in her final two years of employment with Defendant regarding deficiencies in patient care, (Pl.'s Resp. at 1-2) and Defendant lists a total of twenty-nine such complaints. (Def.'s Mot., Ex. B.) On December 1, 2004, Plaintiff called the Community Health Department's complaint hotline to report similar incidents of improper care, and followed up with a written letter to the department's Complaint Investigation Unit on April 19, 2005. (Pl.'s Resp. at 2; Def.'s Mot., Ex. V.) The April 2005 letter indicated that it was carbon copied to Defendant's director of nursing at the time, Donna Dixon. On April 29, 2005, Sophie Skoczen, manager of the investigation unit, sent a letter to Plaintiff at Defendant's

---

[2]"LPN" stands for Licensed Practical Nurse. (Def.'s Mot. for Summ. J. at 1.)

2

address stating that an on-site visit would be conducted to investigate Plaintiff's allegations. (Pl.'s Resp., Ex. 4.) As with other mail sent to nurses at the facility, this letter was taped to the wall next to the time clock where employees punched in and out. (Elie Dep. at 139; Rottach Dep., Pl.'s Resp., Ex. 2 at 58-59.) Plaintiff claims that "[i]n that location, the envelope from the Community Health Department was plainly visible to all employees, department heads and administration." (Pl.'s Resp. at 3.)

Plaintiff filed a lawsuit against Defendant under the WPA on May 3, 2005, although she did not serve Defendant until July 29, 2005, the date of her termination. (Def.'s Mot. at 3.) Heidi Rottach, one of Defendant's administrators, received notice of this lawsuit on May 5, 2005 by way of a solicitation from the law firm of Keller Thoma that included a copy of Plaintiff's Complaint. (Def.'s Mot., Ex. X; Rottach Dep. at 43-44.) She simply passed the letter on to individuals in Defendant's human resources and legal departments, and did not take any further action with regards to Plaintiff's WPA claim at that point in time. (Rottach Dep. at 45.)

In response to Plaintiff's April 2005 complaint to the Community Health Department, a state investigator conducted an unannounced inspection of Defendant's facility on June 27, 2005. (Pl.'s Resp. at 4.) At the close of this investigation, Defendant received seven citations related to various allegations made in Plaintiff's complaint, and the investigator filed a final report detailing the violations on July 18, 2005. (*Id.*) When combined with other past violations at this facility, (Pl.'s Resp., Ex. 9) Defendant was liable for a daily fine of $350.00 for as long as the most recent violations persisted. Periodic inspections in the fall of 2005 revealed that the violations did not cease until November 1, 2005, and Defendant was liable for a total fine of $37,900.00.

3

In addition, Defendant had to pay a third party to train its nursing staff, as the violations resulted in a two-year ban on training its own staff.  (Skoczen Dep., Pl.'s Resp., Ex. 6 at 28-29; Pl.'s Resp. at 5.)

Plaintiff has filed at least two charges of unlawful discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission ("EEOC").  On December 22, 2004, Plaintiff filed a charge of racial discrimination, but the Commission dismissed this charge on February 24, 2005 due to insufficient evidence of a violation following its investigation.  (Def.'s Mot., Exs. D and E.)  Then, on August 29, 2005, Plaintiff filed an EEOC charge of retaliation following Defendant's termination of her employment.  This charge was dismissed on October 31, 2005, also for lack of evidence.  (Def.'s Mot., Ex. K.)  In addition, Defendant notes numerous occasions where Plaintiff claimed that internal disciplinary actions against her, including attending required in-service training sessions, constituted harassment and discrimination by Defendant.  (Def.'s Mot. at 1-2.)  None of the reasons for any disciplinary action taken against Plaintiff prior to her termination are relevant for purposes of the instant motion, however.

The events leading to Plaintiff's termination began with a request from the day shift manager, Leslie Beausejour, that Plaintiff measure the wounds of a resident named "L.C." during her normal midnight shift on July 20, 2005, as L.C. did not want Beausejour to change her dressings during the prior day shift.  (Pl.'s Resp. at 5; Def.'s Mot., Ex. G.)  That night, Plaintiff was scheduled to work the Gold Hall of Defendant's facility.  (*Id.*, Ex. 11.)  L.C.'s room was located in the Blue Hall.  (Pl.'s Resp. at 5 n.3.)  Plaintiff alleges that when she went to the resident's room at 11 p.m., L.C. refused to

4

allow her wounds to be measured, and Plaintiff noted this refusal on L.C.'s medical chart. (Pl.'s Resp. at 5-6; Def.'s Mot., Ex. H.) L.C. apparently refused the same request for another nurse the following day.[3] (Pl.'s Resp., Ex. 13.) Of note, L.C. had previously requested that her dressings only be changed during daytime hours, (Pl.'s Resp., Ex. 12) and was prone to periods of confusion as of July 15, 2005. (Def.'s Mot., Ex. H.)

When Beausejour approached L.C. on July 21 to see why she had refused Plaintiff's request to measure her wounds the night before, L.C. denied any refusal on her part. L.C.'s roommate "J." corroborated L.C.'s statements when Beausejour questioned her as well. (Def.'s Mot., Ex. I.) Furthermore, L.C. gave the same response on four separate occasions when Beausejour questioned her on the morning of July 21. (Beausejour Dep., Def.'s Mot., Ex. DD at 69.) Beausejour and Defendant's new director of nursing, Diane Ryniak,[4] made Rottach aware of the potential falsification of L.C.'s chart, and Rottach ordered a further investigation of these claims. (Rottach Dep. at 40-41.) Defendant suspended Plaintiff until the investigation was complete.

The investigation included further interviews with J., Plaintiff, and other staff members working the shift on July 20. L.C. was not interviewed again, as she had previously requested to not be asked any more questions about the incident. Plaintiff was the only person who indicated that L.C. refused treatment, and the other staff members reported that they did not observe any residents refuse treatment that night.

---

[3]Exactly what L.C. refused is not clear, as the chart is illegible. Defendant does not dispute Plaintiff's reading of the chart on this point, however.

[4]Defendant's former director of nursing, Diana Dixon, who was carbon copied on Plaintiff's April 19, 2005 written complaint to the Community Health Department, ended employment with Defendant on June 14, 2005. (Dixon Decl., Def.'s Mot, Ex. W ¶ 1.)

5

(Def.'s Mot., Ex. CC.)  During this time, Plaintiff wrote a letter to Defendant's corporate offices, complaining of ongoing harassment and retaliation, (Def.'s Mot., Ex. EE) which precipitated a second interview with many of the witnesses involved in the investigation. (Def.'s Mot. at 7-8.)  The investigation confirmed that Plaintiff falsified L.C.'s medical chart, and Defendant terminated her on July 29, 2005 for a violation of its established policies.  At this point, Plaintiff served Defendant with the Complaint that underlies the instant case now before this Court.

## II.  STANDARD OF REVIEW - MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere

6

allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. ANALYSIS

Plaintiff claims that Defendant violated the WPA, which provides, in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362. In order to state a prima facie case of discrimination or retaliation under the statute, Plaintiff must show that she (1) "was engaged in protected activity as defined by the act, (2) the defendant discharged [her], and (3) a causal connection exists between the protected activity and the discharge." *Chandler v. Dowell Schlumberger, Inc.*, 572 N.W.2d 210, 212 (Mich. 1998). It is undisputed that Plaintiff meets the first two prongs of a prima facie case, but Defendant argues that she has not pled causation, as "a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action. *West v. General Motors Corp.*, 665 N.W.2d 468, 472-73 (Mich. 2003).

The WPA is a remedial statute that is to be liberally construed. *Shallal v. Catholic*

7

*Social Services of Wayne County*, 566 N.W.2d 571, 575 (Mich. 1997).  Nevertheless, "an employer is entitled to objective notice of a report or a threat to report by the whistleblower" before the plaintiff has a valid claim under the WPA.  *Kaufman & Payton, P.C. v. Nikkila*, 503 N.W.2d 728, 732 (Mich. Ct. App. 1993).  Defendant claims that (1) Plaintiff has not shown the requisite level of causation, and, alternatively, (2) she did not give proper notice of her Community Health Department complaint under *Kaufman*.

Once a plaintiff has pled a prima facie case under the WPA, the burden shifts back to the defendant to assert a legitimate non-discriminatory or non-retaliatory justification for the adverse employment action.  *Eckstein v. Kuhn*, 408 N.W.2d 131, 134 (Mich. Ct. App. 1987).  Here, it is undisputed that Plaintiff's actions of falsifying medical records, if true, would meet Defendant's burden of production on this point.  Therefore, the burden would shift back to Plaintiff to demonstrate that Defendant's justification was pretext for unlawful discrimination or retaliation.  *Id.*  "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Roulston v. Tendercare (Michigan), Inc.*, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000).  Defendant argues that even if Plaintiff has stated a prima facie case under the WPA, that she has failed to show how their legitimate justification was pretext.

### A.  Plaintiff has not Pled a Sufficient Causal Relationship

Plaintiff's protected activities under the facts of this case include (1) placing several phone calls to Michigan's Community Health Department on December 1, 2004 where she allegedly reported patient care violations, (Pl.'s Resp., Ex. 3) (2) sending a written complaint to the same department on April 19, 2005, and (3) filing her Complaint

8

against Defendant under the WPA on May 3, 2005.[5]  Therefore, Plaintiff must show a sufficient causal connection between at least one of these events and her eventual termination on July 29, 2005.  The parties cite several cases in seeking to elucidate the requisite causal connection for a valid WPA claim.

In *West v. General Motors*, the plaintiff was involved in a physical altercation with another one of the defendant's employees on May 4, 1997, and reported the alleged assault to police.  665 N.W.2d at 470.  While the plaintiff's supervisors at the time were aware of his call to the police, the only evidence he produced was that one was "nonchalant" upon hearing the news and the other "did seem upset that the incident with [the other employee] occurred," but there was no indication that the second supervisor was troubled by the plaintiff reporting this incident to authorities.  *Id.* at 472.  Prior to this time, the plaintiff had been warned about incorrect reporting of overtime, and he was subsequently found to have claimed extra overtime on May 22, 1997 and again on October 16, 1997.  The first infraction resulted in the plaintiff being restricted from working overtime, moved from first to second shift and required to swipe his identification card whenever entering or exiting the plant.  The second offense led to the plaintiff's termination on January 8, 1998.  *Id. at* 470.

---

[5]While Plaintiff concedes that she did not serve Defendant with the Complaint in this case until July 29, 2005, Defendant's administrator, Heidi Rottach, admits that she obtained a copy of Plaintiff's complaint along with a solicitation letter from the law firm of Keller Thoma on or around May 5, 2005.  (Rottach Dep. at 43-44.)  Similarly, Dixon denies receiving a copy of Plaintiff's April 19, 2005 complaint letter to the state.  (Dixon Decl., Def.'s Mot., Ex. W ¶ 4).  It is true that Plaintiff testified that she does not know if Dixon actually received the letter, (Elie Dep., Def.'s Reply, Ex. A at 132) but Plaintiff believes she "mailed it to [Dixon]." (Elie Dep., Pl.'s Resp., Ex. 1 at 166.)  Thus, viewed in a light most favorable to Plaintiff, Defendant was aware of both her Complaint and complaint letter sometime in early May and late April, respectively.

In holding that the trial court properly granted summary judgment to the defendant on the plaintiff's WPA claim, the Michigan Supreme Court focused on two main facts. First, none of the plaintiff's evidence suggested that either of his supervisors "viewed the call as a matter of any consequence" as a result of their lack of a reaction after learning of the police report.  *Id.* at 472.  Secondly, the plaintiff's supervisors at the time of the alleged assault were not involved in the subsequent decision to terminate his employment.  *Id.*  "[S]uch a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action."  *Id.* at 472-73.  "To prevail, plaintiff had to show that his employer took adverse employment action *because of* plaintiff's protected activity, but plaintiff has merely shown that his employer disciplined him *after* the protected activity occurred."  *Id.* at 472 (emphasis in original).[6]

In response, Plaintiff cites *Roulston v. Tennessee*, 608 N.W.2d 525.  In that case, the plaintiff was a nurse who filed a complaint of patient abuse with state authorities on or about June 12, 1996.  Then, on June 21, the plaintiff notified a co-worker about this complaint, and after lunch that day the plaintiff's supervisor came into her office "angry, red in the face," and terminated the plaintiff, telling her "You're through."  *Id.* at 528.  The defendant justified the plaintiff's firing based upon

---

[6]Defendant also cites an unreported opinion of this Court granting a defendant's motion for summary judgment on several claims, including one under the WPA.  *See Scott v. Total Renal Care, Inc.*, No. 04-71700, 2005 WL 1680677 (E.D. Mich. July 19, 2005) (Edmunds, J.), *aff'd on other issues*, *Scott v. Total Renal Care, Inc.*, 194 F. App'x 292 (6th Cir. 2006).  *Scott* is factually distinguishable from the instant case, however, as the unrebutted evidence in that case showed that "Defendants' employees all assumed that the January 2004 state audit was triggered by a patient's complaint, and all were unaware of Plaintiff's verbal complaint to state regulators."  *Id.* at *8

performance-related issues.  In upholding the trial court verdict in favor of the plaintiff, the Michigan Court of Appeals noted that the plaintiff provided much more evidence beyond mere temporal proximity, thus satisfying the requisite causal connection.  "The extent of [her supervisor]'s anger, being red in the face, his abrupt 'you're through,' as well as his standing by until plaintiff removed her belongings and left the building, all suggest" a retaliatory inference.  *Id.* at 530.  In this case, Plaintiff alludes to the fact that both she and the plaintiff in *Roulston* shared a common trait of being "known as a patient advocate," who "regularly reported violations in patient care."  (Pl.'s Resp. at 13.) Plaintiff further argues that "[i]n *Roulston*, the plaintiff had much less evidence to support the causal connection between her protected activity and her termination than the present case."  (Pl.'s Resp. at 14.)

    The Court reaches exactly the opposite conclusion and finds *Roulston* to be factually distinguishable from the instant case.  In addition to the angry reaction that the plaintiff's supervisor exhibited in *Roulston*, it must also be noted that the plaintiff's termination at issue in that case happened *on the same day* that the plaintiff mentioned her complaint to another one of the defendant's employees.  Here, however, Defendant's knowledge of Plaintiff's state complaint and WPA lawsuit occurred nearly three months before her termination, and Plaintiff has not raised a shred of evidence regarding any of Defendant's employees' reactions once they found out about her protected activities to suggest that any of them were troubled by these actions.  At best, Plaintiff provides mere conjecture that Defendant must have cared about the consequences of her Community Health Department complaint, which ended up costing Defendant $37,900.00 in monetary fines plus additional employee training expenses.

11

(Pl.'s Resp. at 10-11.)  She has also failed to identify any ways that Defendant treated her differently after late April to early May, compared to how she was treated prior to that time.

*West*, on the other hand, is factually similar to the instant case, and suggests that Plaintiff has not met her burden of raising sufficient evidence of causation.  Here, the evidence on the record shows that Defendant's employees knew that complaints of patient care violations were a relatively frequent occurrence in this industry, and were not something that made them overly concerned.  (Rottach Dep. at 25-26; Powell Dep., Def.'s Mot., Ex. JJ at 40-41.)  Furthermore, Plaintiff brings no evidence to suggest that her supervisors were angered by her complaints.

As to the issue of notice, only Dixon and Rottach had knowledge of Plaintiff's protected activity prior to her termination.[7]  Notably, both of the employees who initially uncovered the potential discrepancy with L.C.'s medical chart, Beausejour and Riniak, affirmatively state that they did not know of the source of any particular complaints to the state.  (Beausejour Dep. at 60; Riniak Decl., Def.'s Mot., Ex. HH ¶¶ 4-5.)  Since Defendant no longer employed Dixon by the time of Plaintiff's termination, Rottach was

---

[7]In arguing that other employees of Defendant knew of her Community Health Department complaint, Plaintiff raises the issue of a response letter that the department sent to her at Defendant's address.  As with other mail for nurses, the letter was taped to a wall near the time clock where nurses punch in and out and Plaintiff claims that "the envelope from the Community Health Department was plainly visible to all employees, department heads and administration."  (Pl.'s Resp. at 3.)  First of all, Plaintiff's deposition does not establish that the letter had even been opened prior to being placed on the wall, (Elie Dep. at 135-40) and her statement in response to Defendant's motion appears to suggest otherwise.  Even if the letter was opened and visible, and might have been seen by another employee, this would not rise to the level of "objective notice" to Defendant that is required under *Kaufman*, 503 N.W.2d at 732.

12

the only individual related to this decision who had knowledge of Plaintiff's WPA-related actions. Although Rottach was involved in the decision to terminate Plaintiff, her role as administrator was effectively to approve a department head's recommendation regarding the employee:

> Q: Are you the one who ultimately terminated or authorized the termination of Roxanne Elie?
>
> A: The department heads, her supervisor would do that.
>
> Q: Which part, recommend it or authorize it or –
>
> A: Her supervisor would authorize the termination. I was brought in to review it and see if I agreed.
>
> Q: If you agreed then the department head would have authority to terminate, is that correct?
>
> A: Correct.
>
> Q: If you disagreed, the department head would not have authority to terminate, is that correct?
>
> A: At that point, it would be more if I thought we needed to interview anybody else or do anything further. You know, I was a – what's the word I'm looking for? I was the overseer who, if I thought of something, a next step, they needed to do.

(Rottach Dep. at 41-42.) Thus, Rottach's role appears to be more akin to a rubber stamp of Plaintiff's supervisor's decision. Since Riniak was without knowledge of Plaintiff's complaints at the time of the termination, the fact that Rottach happened to know of Plaintiff's unserved Complaint is insufficient to show that Defendant had the requisite notice of Plaintiff's activities in order for her to have a viable WPA claim.

For all of the above reasons, Plaintiff has failed to state a prima facie claim under the WPA.

13

**B. Defendant's Legitimate Justification and Plaintiff's Attempt to Show Pretext**

Even assuming, for sake of argument, that Plaintiff stated a valid prima facie case under the WPA, her claim would fail for lack of evidence to show that Defendant's legitimate justification that she was terminated for falsifying medical charts was pretext. First of all, Plaintiff's apparent argument that she had no history of falsifying records is irrelevant, as she brings no evidence that Defendant did not fire other nurses upon a first infraction of this nature. Next, Plaintiff challenges several aspects of the investigation that led to her termination. Specifically, that Rottach did not follow Defendant's investigative procedures by failing to document an interview with L.C.'s roommate, and that Rottach withheld information about the incident with L.C. when discussing it with one of Defendant's consultants, Pat Roggenbeck. Plaintiff points to a hypothetical posed to Roggenbeck during her deposition based upon the full facts of this case, where Roggenbeck stated she "could not come to [the] conclusion [that Plaintiff falsified L.C.'s records] based on what you said to me." (Roggenbeck Dep., Pl.'s Resp., Ex. 16 at 42.) Still, Plaintiff makes no showing that Roggenbeck was actually involved in the termination decision, outside of providing a clinical opinion to Rottach that it would be important to verify that L.C. was not confused at the time Plaintiff tried to measure her wounds. (*Id.* at 33-34.)

To reiterate, "[a] plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston*, 608 N.W.2d at 530. At best, Plaintiff's arguments on this point indicate that Defendant did not

14

conduct a perfect investigation of her interactions with L.C.  That said, Plaintiff does not cite any cases for her apparent proposition that the investigation underlying a WPA defendant's decision to terminate an employee needs to comply with its policies in every manner.  For these reasons, Plaintiff has not established that Defendant's legitimate justification was pretext, even if she had raised a prima facie case under the WPA.

### C. Plaintiff's Potential Bad Faith is Irrelevant

Defendant also argues that Plaintiff's claim should be dismissed because her protected activities were undertaken in bad faith.  As the Court has already found that Plaintiff's claims fail as a matter of law, it need not reach this alternative ground for dismissal.

## IV. CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders that Defendant's motion for summary judgment is GRANTED, and this case is DISMISSED.

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 13, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 13, 2007, by electronic and/or ordinary mail.

15

s/Carol A. Hemeyer
Case Manager

16